**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Penny Lynn Morris, | ) | Case No.: 11-03628-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | | |
| Penny Lynn Morris, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 12-00071-BGC |
| | ) | |
| Wells Fargo, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

The matter before the Court is the defendant Wells Fargo, N.A.'s <u>Motion for Summary Judgment</u> filed on April 25, 2013. A.P. Docket No. 15. After notice, a hearing was held on September 12, 2013. Appearing were Ms. Catherine Crosby Long, the attorney for the defendant; Ms. Eugenia W. Hamilton, the plaintiff's attorney; and the plaintiff, Ms. Penny Lynn Morris.

The pending motion was filed in response to the Debtor's <u>Complaint Against Wells Fargo for Violation of the Stay</u>, filed May 13. 2012, A.P. Docket No. 1.

The matter was submitted on the records in this case and in Bankruptcy Case No. 11-03628-BGC-7, the briefs of counsel, and attached exhibits. Based on those submissions, the Court finds that there are no genuine issues of material fact, and that the defendant is entitled to judgment as a matter of law.

### I. Findings of Fact

On May 15, 2004, the debtor-plaintiff, Ms. Penny Morris obtained a loan for $133,000 from Americapital Funding Corp. Repayment of the loan was secured by a mortgage on her residence located at 1816 Valgreen Lane in Birmingham, Alabama. The note executed by Ms. Morris in connection with that loan required her to repay the amount borrowed, with interest at the rate of 5.875% per annum, over a period of 30 years in monthly installments of $786.75 each. When she obtained the loan, Ms. Morris was gainfully employed and had the ability to make her loan payments.

On April 30, 2005, Wells Fargo became the servicer of the note and mortgage.

In 2006, Ms. Morris contracted rheumatoid arthritis which impeded her ability to work full time resulting in a dramatic reduction of her income. By July 2008, she had been rendered completely disabled by the disease, which required her to apply for social security disability payments. Her application was granted, but payments did not begin until about six months later. Around that time, she also began to receive social security benefits for the support for her minor son.

Because of her physical impairment, Ms. Morris's financial situation deteriorated, and she was unable to make all of her mortgage payments. In an effort to rectify that default, Wells Fargo extended to Ms. Morris the opportunity to enter into a forbearance agreement that would permit her to avoid foreclosure and cure her default. This "Special Forbearance Agreement" was executed by Ms. Morris on June 28, 2009. Brief in Support of Motion for Summary Judgment, A.P. Docket No. 16, Exhibit B. The agreement required Ms. Morris to make a payment of $511.03 on July 20, 2009; another payment of $511.03 on August 20, 2009; a third payment of $511.03 on September 20, 2009; and a payment of $5,595.34 on October 20, 2009.

Ms. Morris was not able to satisfy the terms of the "Special Forbearance Agreement;" therefore, the loan remained in default. Seeking to address her mortgage arrearage, on September 13, 2009, Ms. Morris executed another agreement with Wells Fargo, this time a "Home Affordable Modification Trial Period Plan." Brief in Support of Motion for Summary Judgment, A.P. Docket No. 16, Exhibit C. The copy of that agreement attached to Wells Fargo's motion contains no information about the amount of the arrearage, or how the payments were to be caught up, or what other modifications, if any, were to be made to the loan. It is merely a form document, bearing Ms. Morris' signature and handwritten date, with standard printed language and blanks to be filled in for custom information related to the loan in question, which had not been filled in.

While it was not possible to tell what the terms of the second agreement between Ms. Morris and Wells Fargo were relating to catching up the loan arrearage, it is possible to determine that the loan remained in default and the missed payments were not paid. This condition led to a third loan modification agreement between the parties on March 19, 2010. Brief in Support of Motion for Summary Judgment, A.P. Docket No. 16, Exhibit D. Under that agreement, entitled "Loan Modification Agreement," the parties agreed that the unpaid balance due on the loan was $126,606.73; that Ms. Morris would not have to make a payment until June 1, 2010; that her monthly payments would be increased to $820.73; that the maturity date on the loan would not change but would remain June 1, 2034; and that she would pay any balance that remained on the loan on the maturity date.

Again, Ms. Morris was not able to make the payments in the agreement and bring her mortgage payments current. Her efforts were rendered even more difficult in

April 2011 when her minor son reached 18 years old, and she stopped receiving social security assistance for him.

Based on the parties' contracts and the missed payments, Wells Fargo accelerated the note then scheduled and noticed a foreclosure sale.

Ms. Morris filed the pending Chapter 7 bankruptcy case on July 21, 2011, prior to the scheduled foreclosure sale. Wells Fargo filed a Motion for Relief from Automatic Stay. Case Docket No. 26. The fact summary filed by Wells Fargo in support of its motion indicated at the time Ms. Morris was $3,347.01 in arrears on her mortgage payments. Fact Summary for Motion for Relief From Automatic Stay in Chapter 7 and 13 Cases, Case Docket No. 27. After notice, a hearing was held on September 27, 2011. Appearing were Ms. Morris and her attorney, Ms. Eugenia Hamilton, and Mr. Tom Tutten, one of the attorneys for Wells Fargo. On September 30, 2011, this Court entered an order granting the motion for relief. Case Docket No. 32.

On October 11, 2011, Ms. Morris filed a Motion to Reinstate the Stay Against Wells Fargo, Case Docket No. 34. It read:

> On September 27, 2011 the Debtor appeared before this Honorable Court and agreed to lift the stay against Wells Fargo in this case in an effort to work toward a loan modification so she may keep her home. On the date, the Debtor asked if she would be able to meet with a representative of Wells Fargo in person for the negotiation of the loan modification and was assured that could and would happen.

> Since that time, the Debtor has spent approximately ten hours trying to arrange an in-person meeting with a Wells Fargo representative authorized to handle a loan modification. This attorney has spent over five hours trying to arrange a meeting and has also had an assistant spend several hours on the project. To date, we have been unable to find anyone willing to meet with us to accomplish this goal.

> Ms. Morris feels that a face-to-face meeting is imperative as her previous experiences with Wells Fargo have been extremely stressful and negative. Twice she has negotiated a loan modification by phone only to be told by the next caller from Well Fargo that the last person she had spoken with did not have the authority to negotiate the deal. On another occasion, a man came to Ms. Morris's home with proper credentials from Wells Fargo to negotiate a loan modification. They spent hours completing forms and arriving at a deal. The very next day the man returned and informed her that he had been fired by Wells Fargo and the modification would not be approved.

3

On the day of the hearing, Debtor and her attorney spoke with the Honorable Mr. Tutten representing Wells Fargo about a loan modification. He advised them to contact the "Loss Mitigation Department." After two hours on the phone, this attorney was informed there is no "loss mitigation department" and to contact the attorney who handled the case and that attorney would handle the loan modification. As Mr. Tutten had already informed us he did not handle that part, this attorney was hesitant, but did attempt to call Mr. Tutten and finally sent an email. His response was not at all helpful.

Ms. Morris is disabled and suffers from stress related illnesses. This issue is extremely important to her as she wants to keep her home. She begs this Court to set aside its previous ruling and replace the stay against Wells Fargo until such time as an appropriately authorized representative of that company will meet with her face-to face to negotiate a loan modification.

Id.

That motion was heard on November 29, 2011. Appearing were Ms. Morris and her attorney, Ms. Eugenia Hamilton. No one appeared for Wells Fargo.

On December 2, 2011, the Court entered an order that set aside the order granting relief from the stay to Wells Fargo and extended the stay with respect to the Wells Fargo debt and mortgage for 180 days. The stay extension was based on Ms. Morris' representation that a "reasonable" loan modification could be achieved and was relatively imminent. The Court's Order explained:

The debtor's motion relates old and new facts of her attempt to obtain a modification of her mortgage loan with Wells Fargo. At the hearing on that motion the debtor explained in detail the negotiations she has had over the last two years. Those negotiations included many misunderstandings between the parties, difficulties, and multiple submissions of paper work. It also included different representatives of Wells Fargo, as the debtor explains it, representing to the debtor that a loan modification had been approved, or that one was at least possible.

Also at the hearing the debtor discussed two recent events that directly impact the applicability of her Rule 59(e) motion. First, the debtor represented that within the last few days she has spoken with a Wells Fargo representative who assured her that this representative would be the debtor's only contact for arranging the modification, and that this representative would follow the process to a conclusion. Second, the debtor represented that she was told by a representative of Wells Fargo, that her mortgage had, as of November 11, 2011, been referred for foreclosure.

4

It is common knowledge that the process to obtain a loan modification is lengthy.  This Court has considered many recently. This one seems to be back on track and the proper subject of the debtor's Rule 59(e) motion. Both parties desire to complete a modification of the debtor's mortgage loan, and considering the very recent events, the arguments the debtor makes now were not ones she could have made before judgment was entered.  Consequently, this is one of those situations that require the extraordinary relief Rule 59(e) provides to reach a just decision based on the facts.

<u>Order Setting Aside September 30, 2011, Lift of Stay Order</u>, Case Docket No. 40.

The Court's stated purpose of the stay reinstatement and extension was to permit the parties an adequate opportunity to finalize the anticipated loan modification referred to by the debtor at the hearing. The order concluded:

Based on the above, it is **ORDERED** that:

1.   The September 30, 2011, order granting Wells Fargo's request to lift the stay is **SET ASIDE**;

2.   Therefore, the **STAY IN THIS CASE IS IN EFFECT AS TO WELLS FARGO** upon entry of this order;

3.   That stay shall remain in effect as to Wells Fargo for **180 DAYS** from the entry of this order to allow the parties sufficient time to attempt to reach an agreement on modification of the debtor's loan;

4.   However, Well Fargo's <u>Motion for Relief from Automatic Stay</u>, Docket No. 26, is **GRANTED** on the **181st DAY** from entry of this order regardless of whether a loan modification is completed;

5.   The debtor's discharge shall be entered forthwith, and upon entry will constitute relief from the stay pursuant to Section 362(c)(2)(C) of the Bankruptcy Code, 11 U.S.C.  § 362(c)(2)(C), for all of the debtor's creditors **EXCEPT WELLS FARGO**; and

6.   This case shall not be closed until after 182 days from entry of this order.

<u>Id</u>.[1]

_____

[1] The Order did not intend, and could not as this Court clearly had no power to do so, grant Ms. Morris a stress-free, payment-free respite without the expectation and necessity of engaging in an earnest and rigorous effort to negotiate the loan modification that she had

5

According to the court system's certificate of notice, which is intended to reflect who was provided notice of the December 2 order, how they were provided that notice, and when that notice was sent, electronic notification of the order extending the stay was emailed to Wells Fargo's bankruptcy attorney the afternoon of December 2nd at ndbankruptcy@sirote.com, which is the email address shared by him and four other lawyers in the firm who practice in bankruptcy. Certificate of Notice, Case Docket No. 43 (and the notice receipt revealed by clicking on the bullet which appears next to the number 43 on the docket report). The Court is confident that this notice was received as it was sent to the address provided by the law firm.

In contrast, and what the Court did not know then, but knows now is that the order setting aside the lift stay order was not sent specifically to Wells Fargo's foreclosure attorney, who was different from and not on the bankruptcy attorney email list. Consequently, in a classic case of the left hand being unaware of what the right was doing, the foreclosure attorney mailed a letter to Ms. Morris on December 7, 2011, notifying her that foreclosure had been initiated and that, in accordance with Alabama law and the mortgage, the foreclosure would be advertised in the Alabama Messenger, a local newspaper which primarily carries legal notifications and the like. Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit D.

The Court does not know when Ms. Morris received that letter as that information was not contained in the affidavit she submitted in response to Wells Fargo's summary judgment motion; however, because the foreclosure letter reflects that a copy of the same was also sent to Ms. Hamilton, Ms. Morris' attorney, the Court does know that the foreclosure letter must have been received either December 8 or 9 as Ms. Hamilton emailed Wells Fargo's attorney on December 9 to inform her that the stay had been reinstated. Id. While the reply Ms. Hamilton received was a confession by Wells Fargo's foreclosure attorney that she had no knowledge of the order reinstating the stay, it included a promise by Wells Fargo's attorney to immediately terminate the foreclosure process – which was done. That email included, "Thank you for your email and for notifying us that the bankruptcy stay has been reinstated.  We are closing our foreclosure file and notifying our client." Id.

On January 30, 2012, Wells Fargo offered Ms. Morris another loan modification. This one would have reduced her monthly payment to $795.33.  Brief in Support of Motion for Summary Judgment, A.P. Docket No. 16, Exhibit 1. The Declaration of Amanda Weatherly (attached to that brief as A.P. Docket No. 16-1) includes, "On January 30, 2012, Plaintiff was approved for a third loan modification with a first payment date of March 1, 2012. The modification reduced the monthly payments on the Loan to $795.33 by extending the term of the Loan; this was necessary to provide Plaintiff with a monthly payment amount that she could afford based on the financial

---

confidently informed the court was forthcoming, which would include receiving and entertaining communications from Wells Fargo's representatives and employees for that purpose.

information she provided to Wells Fargo." Id.

In the Declaration of Penny Morris (Ms. Morris' affidavit) filed in response to the pending motion for summary judgment, Ms. Morris explained why she rejected this latest, and last loan modification offer. She stated:

> In March 2012, I was offered a loan modification by Wells Fargo. The terms of the modification were unreasonable to me so I refused to accept it. Wells Fargo wanted to extend the life of my loan from the original 30-year period of 2004-34 to a period of 40 years from 2012-52. Over the extended period, the cost to me would be over an additional $152,000 – more than double what is owed on the house now.

Response to Defendant's Motion for Summary Judgment A.P. Docket No. 34, Exhibit A at 6.

As Ms. Morris explained, she rejected the proffered loan modification. Shortly thereafter, on May 13, 2012, she filed her Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1. After including the conclusion to this Court's December 2, 2011, Order (quoted above), the complaint alleged:

> Beginning on December 5, 2011, a representative of Wells Fargo, namely a Jamie Allen, contacted Ms. Morris on a daily basis starting each conversation by requiring Ms. Morris to state her full name, address and telephone number. She then read a disclaimer to Ms. Morris that specifically stated the call was an attempt to collect a debt. Allen continually required Ms. Morris to fax information to her, claiming it is required for consideration of a loan modification. She faxed several copies of information from social security regarding her disability check, her divorce papers at least twice, and every other item requested in an effort to obtain the modification. Initially, Ms. Allen seemed helpful and hopeful with Ms. Morris and told her she was sure they could work out a solution. With each call her attitude digressed further into veiled threats and rudeness and continued to tell Ms. Morris that her home would be sold to the highest bidder on Wednesday, January 11, 2012. Those calls ended on January 10, 2012, only after Ms. Morris had filed a motion with the Honorable Court seeking assistance.

> Additionally, Ms. Morris was contacted by Ms. Ginny Rutledge, Esq. [Wells Fargo's foreclosure attorney] on or about December 6, 2012 by mail informing her that her home would be sold in foreclosure. Ms. Rutledge was contacted by Debtor's attorney and informed of the stay. She responded that she would inform her client. Despite that notification, the calls and letters from Wells Fargo continued to come.

7

Adding further insult to Ms. Morris, she was contacted by at least four attorneys offering to assist her following advertisements placed in the Alabama Messenger listing her home in foreclosure. These ads continued to run after the stay was granted.

In an effort to stop the foreclosure sale, Ms. Morris filed a motion asking this Honorable Court to enforce the stay granted on December 2, 2011 and stop the sale. A hearing on that motion was held on January 25, 2012. After the hearing, Ms. Morris and her counsel met with Mr. Tom Tutten, legal representative for Wells Fargo, [Wells Fargo's bankruptcy attorney] who assured Ms. Morris that there would be no foreclosure and that a reasonable modification was forthcoming. About three weeks later, a modification was offered. Currently, Ms. Morris's current delinquent loan is for approximately $124,091.46 with a monthly payment of $903.65 with approximately 22 years left to pay. The modification offered would extend the loan to a period of forty (40) years with a new payment of $795.33. This represents an increase of over $139,000 in the amount Ms. Morris would be required to pay for the house, which she considers to be unconscionable, unreasonable and predatory.

The Debtor requests that this Honorable Court find Wells Fargo in contempt of its order regarding the stay and require that Wells Fargo be ordered to pay damages to the Debtor for their failure to comply.

The actions of Wells Fargo have caused the Debtor unnecessary emotional and physical stress, including development of a serious heart condition, as well as additional attorney fees. The Debtor also requests any other relief to which she may be entitled under the law.

Id. (parentheticals added).

## II. Summary Judgment Standards

The standards for resolving issues within the context of a summary judgment motion are outlined in the Court of Appeals for the Eleventh Circuit decision in Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993). This Court has applied those standards to the pending matter.

## III. Applicable Law

Section 362(a) of the Bankruptcy Code provides, in applicable part, that the filing of a bankruptcy petition operates automatically as a stay of

8

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [title 11], or to recover a claim against the debtor that arose before the commencement of the case under [title 11];

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under [title 11];

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under [title 11]; [and]

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [title 11] ....

11 U.S.C. § 362(a).

Section 362(k) provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). That section requires that in order for an award of damages to be made to an individual debtor for a stay violation, the proof must show that the debtor was injured by the stay violation and that the violation of the stay by the defendant was willful. A violation of the automatic stay is a "willful violation" if "... the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." Jove Eng'g, Inc. v. Internal Revenue Serv., 92 F.3d 1539, 1555 (11th Cir. 1996).

Section 362(k) authorizes an award of punitive damages for stay violations only in "appropriate circumstances." The phrase "appropriate circumstances" has been interpreted to require the violator's acts to have been egregious, vindictive, malicious, or accompanied by bad faith. "[E]gregious, intentional misconduct on the violator's part is necessary to support a punitive damages award." United States v. Ketelson (In re Ketelson), 880 F.2d 990, 993 (8th Cir. 1989). "An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)." Crysen/Montenay Energy Co. v. Esselen

9

Assocs., Inc. (In re Crysen/Montenay Energy Co.), 902 F.2d 1098, 1105 (2nd Cir. 1990). "[O]nly egregious or vindictive misconduct warrants punitive damages for willful violations of the automatic stay of 11 U.S.C. § 362."  Davis v. Internal Revenue Serv., 136 B.R. 414, 424 (E.D. Va. 1992).

By its plain language, 11 U.S.C. § 362(k) authorizes an award of "actual damages, including costs and attorneys' fees ...." only to "[a]n individual injured by [a] willful violation of a stay ...."  11 U.S.C. § 362(k)(emphasis added).  Conversely, it does not, by its terms, authorize an award of "actual damages, including costs and attorneys' fees ...." to an individual who has not been injured by a violation of the stay.  In re Dawson, 390 F.3d 1139, 1150 (9th Cir. 2004).[2]

_____

[2] See also Glenshaw Glass v. Ontario Grape Growers' Marketing Board, 67 F.3d 470, 477 (3rd Cir. 1995); Lovett v. Honeywell, Inc., 930 F.2d 625, 628 (8th Cir. 1991);  Archer v. Macomb County Bank, 853 F.2d 497, 500 (6th Cir.1988); Salem v. Paroli, 260 B.R. 246, 257 (S.D.N.Y. 2001), aff'd, 79 Fed. Appx. 455, 2003 WL 22440245 (2nd Cir., Oct. 28, 2003); Mann v. Chase Manhattan Mortgage Corp., 2002 WL 32157516, *5 (D.R.I., March 7, 2002), aff'd, 316 F.3d 1 (1st Cir. 2003); Aiello v. Providian Fin. Corp., 257 B.R. 245, 249 (N.D. Ill. 2000), aff'd, 239 F.3d 876 (7th Cir. 2001); Lucabaugh v. United States (In re Lucabaugh), 262 B.R. 900, 905 (E.D. Pa. 2000); Miller v. Blatstein (In re Main, Inc.), 1999 WL 424296, *5 (E.D. Pa., June 23, 1999); Fidelity Nat'l Title Ins. Co. Of New York v. Bozzuto, 227 B.R. 466, 473 n.18 (E.D. Va. 1998); United States v. Academy Answering Service, Inc. (Academy Answering Service, Inc.), 100 B.R. 327, 330 (N.D. Ohio 1989); In re Bain, 64 B.R. 581, 584 (W.D. Va. 1986); In re Marino, 437 B.R. 676, 678 (8th Cir. BAP 2010); Wolkowitz v. Shearson Lehman Brothers, Inc. v. Weisberg (In re Weisberg), 193 B.R. 916, 927 (9th Cir. BAP 1996), aff'd, 136 F.3d 655 (9th Cir. 1998), cert. denied, 525 U.S. 826 (1998); In re Beckett, 455 B.R. 9, 14 (Bankr. D. Mass. 2011); In re Newcomer, 438 B.R. 527, 540 (Bankr. D. Md. 2010); In re Tarone, 434 B.R. 41, 53-54 (Bankr. E.D.N.Y. 2010); In re Sissine, 432 B.R. 870, 885 (Bankr. N.D. Ga. 2010); In re McCool, 446 B.R. 819, 823-824 (Bankr. N.D. Ohio 2010); In re Zajni, 403 B.R. 891, 895 (Bankr. M.D. Fla. 2008); In re Lightfoot, 399 B.R. 141, 148 (Bankr. E.D. Pa. 2008); In re Weidner, 384 B.R. 9, 12 (Bankr. D. Alaska 2008); In re Sullivan, 357 B.R. 847, 856 (Bankr. D. Colo. 2006); In re Hutchings, 348 B.R. 847, 901 (Bankr. N.D. Ala. 2006);  In re Wiley, 315 B.R. 682, 690 (Bankr. E.D. La. 2004);  In re Peterson, 297 B.R. 467, 470 (Bankr. W.D.N.C. 2003); Adams v Peterson (In re Adams), 2002 WL 844350, *2 (Bankr. N.D. Iowa, April 19, 2002);  In re Martinez, 281 B.R. 883, 886-887 (Bankr. W.D. Tex. 2002); Clement v. GF Winnelson Co. (In re Clement), 2002 WL 31342411, *5 (Bankr. D.N.D., Aug. 6, 2002); Garland v. Lawton (in re Garland), 2001 WL 34798966, *7 (Bankr. D. Vt., Aug. 1, 2001); Moodie v. Thrifty Rent-A-Car System, Inc. (In re Moodie), 2001 WL 34050728, *3 (Bankr. D. Vt., July 16, 2001); Felder v. American General Finance (In re Felder), 2000 WL 33710885, *6 (Bankr. D.S.C., July 7, 2000); In re Skeen, 248 B.R. 312, 318 (Bankr. E.D. Tenn. 2000); Aiello v. Providian Fin. Corp., 231 B.R. 684, 689 (Bankr. N.D. Ill. 1999), aff'd, 257 B.R. 245 (N.D. Ill. 2000), aff'd, 239 F.3d 876 (7th Cir. 2001); Mullins v. Land (In re Mullins), 1998 WL 34064588, *2 (Bankr. C.D. Ill., Jan. 15, 1998); Weisberger v. United States (In re Weisberger), 205 B.R. 727, 733 (Bankr. M.D. Pa. 1997);  In re Palumbo Family Limited Partnership, 182 B.R. 447, 471 (Bankr. E.D. Va. 1995); Gordon v. Dennis Burlin Sales, Inc., 174 B.R. 257, 260 (Bankr. N.D. Ohio 1994); General Ins. Co. of America v. Anderberg-lund Printing Co. (In re Anderberg-lund Printing Co.), 1994 WL 692953, *6 (Bankr. D. Minn., Dec. 9, 1994); In re Smith, 1994 WL 900507, *3 (Bankr. E.D. Va.,

Case 12-00071-BGC   Doc 42   Filed 07/28/14   Entered 07/29/14 14:32:37   Desc Main
Document      Page 10 of 35

Writing for the court in <u>Lodge v. Kondaur Capital Corp. (In re Lodge)</u>, 750 F.3d 1263 (11th Cir. May 2014), Circuit Judge Frank M. Hull explained, "not every willful violation of the stay merits compensation for emotional distress ...." <u>Id</u>. at 1271. She added, "at a minimum, to recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." <u>Id</u>. 1271. And, "'fleeting or trivial anxiety or distress' " will not suffice. <u>Id</u>. (quoting <u>Dawson v. Washington Mutual Bank (In re Dawson)</u>, 390 F.3d 1139, 1149 (9th Cir. 2004)).  Nor will mere aggravation, indignation and annoyance, or being "upset," warrant compensation under section 362(k).[3]

Again, Judge Hull explains, to recover for significant emotional distress requires more than, "generalized evidence [of being] 'stressed out.' " <u>In re Lodge</u> at 1272. And, "generalized evidence, without any additional, specific detail, does not show that the [debtors] suffered significant emotional distress ...." <u>Id</u>. (parenthetical added). Judge Hull concluded, while not definitive, "corroborating evidence may not be necessary to

---

Aug. 29, 1994); <u>In re Wright</u>, 156 B.R. 549, 552 (Bankr. N.D. Ill.  1992); <u>New MMI Corp. v. Robec, Inc. (In Micro Marketing International, Inc.)</u>, 150 B.R. 573, 575 (Bankr. M.D. Pa. 1992); <u>Whitt v. Philadelphia Housing Authority (In re Whitt)</u>, 79 B.R. 611, 615-616 (Bankr. E.D. Pa. 1987); <u>Federal Land Bank of St. Louis v. Heiserman (In re Heiserman)</u>, 78 B.R. 899, 904 (Bankr. C.D. Ill. 1987); <u>In re Freunscht</u>, 53 B.R. 110 (Bankr. D. Vt. 1985).

[3] See <u>Dawson v. Washington Mutual Bank (In re Dawson)</u>, 390 F.3d 1139 (9th Cir. 2004); <u>Aiello v. Providian Fin. Corp.</u>, 239 F.3d 876 (7th Cir. 2001); <u>Taylor v. United States (In re Taylor)</u>, 263 B.R. 139 (N.D. Ala. 2001); <u>Rosengren v. GMAC Mortgage Corp.</u>, 2001 WL 1149478 (D. Minn., Aug. 7, 2001); <u>Patton v. Shade</u>, 263 B.R. 861 (C.D. Ill. 2001); <u>Aiello v. Providian Fin. Corp.</u>, 257 B.R. 245 (N.D. Ill. 2000), <u>aff'd</u>, 239 F.3d 876 (7th Cir. 2001); <u>McHenry v. Key Bank (In re McHenry)</u>, 179 B.R. 165 (9th Cir. BAP 1995); <u>In re Bryant</u>, 294 B.R. 791 (Bankr. S.D. Ala. 2002); <u>In re Parker</u>, 279 B.R. 596 (Bankr. S.D. Ala. 2002); <u>In re Skeen</u>, 248 B.R. 312 (Bankr. E.D. Tenn. 2000); <u>Stewart v. United States (In re Stewart)</u>, 2000 WL 1194437 (Bankr. S.D. Ga., July 9, 2000); <u>Aiello v. Providian Fin. Corp. (In re Aiello)</u>, 231 B.R. 684 (Bankr. N.D. Ill. 1999), <u>aff'd</u>, 257 B.R. 245 (N.D. Ill. 2000), <u>aff'd</u>, 239 F.3d 876 (7th Cir. 2001); <u>In re Robinson</u>, 228 B.R. 75 (Bankr. E.D.N.Y. 1998); <u>Diviney v. Nations Bank of Texas (In re Diviney)</u>, 211 B.R. 951 (Bankr. N.D. Okla. 1997), <u>aff'd</u>, 225 B.R. 762 (10th Cir. BAP 1998); <u>Meis-Nachtrab v. Griffin (In re Meis-Nachtrab)</u>, 190 B.R. 302 (Bankr. N.D. Ohio 1995); <u>Washington v. Internal Revenue Service (In re Washington)</u>, 172 B.R. 415 (Bankr. S.D. Ga. 1994), <u>aff'd in part, reversed in part</u>, 184 B.R. 172 (S.D. Ga. 1995); <u>In re McPeck</u>, 1991 WL 8405 (Bankr. D. Minn., Jan. 29, 1991); <u>In re Suarez</u>, 149 B.R. 193 (Bankr. D.N.M. 1993); <u>Colon v. Hart (In re Hart)</u>, 114 B.R. 890 (Bankr. E.D. Pa. 1990), <u>appeal dismissed sub nom.</u>, <u>Szostek v. Hart</u>, 123 B.R. 719 (E.D. Pa. 1991), <u>aff'd in part, appeal dismissed in part</u>, 941 F.2d 242 (3rd Cir. 1991); <u>Crispell v. Landmark Bank (In re Crispell)</u>, 73 B.R. 375 (Bankr. E.D. Mo. 1987); <u>Worthing v. Connecticut Nat'l Bank (In re Worthing)</u>, 24 B.R. 774 (Bankr. D. Conn. 1982); <u>In re Demp</u>, 23 B.R. 239 (Bankr. E.D. Pa. 1982).

prove emotional distress where the violator engaged in egregious conduct and significant emotional distress is readily apparent." Id. But definitely, where the violator's conduct was not egregious and significant emotional distress is not, therefore, readily apparent, corroboration requires more than the plaintiff's generalized claims or descriptions of emotional distress.  Hence, failure of a plaintiff to corroborate alleged significant emotional distress injuries with more than his or her own affidavit containing generalized claims or descriptions of emotional distress will not withstand the defendant's summary judgement motion where "[n]othing else in the record makes it obvious that the [plaintiff] suffered significant emotional distress." Id.

As is obvious, all of the above-standards are quite stringent. They would be difficult to satisfy in any case. Unfortunately for Ms. Morris, while she has had a difficult situation for several years involving her health and her finances, she was unable to do so in this case.

## IV.  Conclusions of Law

In her complaint, Ms. Morris identifies four ways she contends Wells Fargo violated the extended stay:

A.   Initiating the Foreclosure Process – First, Ms. Morris contends that Wells Fargo violated the extended stay by beginning the foreclosure process, as evinced by Ms. Rutledge's December 7 letter. This contention had three parts. Those are:

1.   Did Wells Fargo willfully violate the stay by sending the December 7, 2011, letter, initiating foreclosure, or advertising the foreclosure?

2.   Was Ms. Morris injured by anything Ms. Rutledge did?

3.   Was Ms. Morris injured as a result of calls she received from attorneys neither associated with nor employed by Wells Fargo, and if she was, would Wells Fargo be responsible for those injuries?

B.   Making Calls and Sending Letters - Second, Ms. Morris contends that Wells Fargo violated the extended stay when it sent her letters and called her on the telephone.

C.   Failing to Provide a "Reasonable" Loan Modification - Third, Ms. Morris contends that Wells Fargo violated the extended stay by failing to provide her with a "reasonable" loan modification.

12

D.    Violating a National Consent Settlement - Fourth, Ms. Morris contends that Wells Fargo violated the stay by its noncompliance with a national consent settlement between major mortgage servicing companies and the attorneys general of several states, to which Wells Fargo was signatory.

## A.  Initiating the Foreclosure Process

### 1.  Did Wells Fargo willfully violate the stay by sending the December 7, 2011, letter, initiating foreclosure, or advertising the foreclosure?

With respect to this contention, as quoted above, Ms. Morris alleged:

> Additionally, Ms. Morris was contacted by Ms. Ginny Rutledge, Esq. on or about December 6, 2012 by mail informing her that her home would be sold in foreclosure.  Ms. Rutledge was contacted by Debtor's attorney and informed of the stay.  She responded that she would inform her client. Despite that notification, the calls and letters from Wells Fargo continued to come.

> Adding further insult to Ms. Morris, she was contacted by at least four attorneys offering to assist her following advertisements placed in the Alabama Messenger listing her home in foreclosure.  These ads continued to run after the stay was granted.

> In an effort to stop the foreclosure sale, Ms. Morris filed a motion asking this Honorable Court to enforce the stay granted on December 2, 2011 and stop the sale.  A hearing on that motion was held on January 25, 2012.  After the hearing, Ms. Morris and her counsel met with Mr. Tom Tutten, legal representative for Wells Fargo, who assured Ms. Morris that there would be no foreclosure and that a reasonable modification was forthcoming.

Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1.

The only evidence before the Court in this regard is Ms. Morris' one reference to foreclosure in the affidavit she filed in response to Wells Fargo's summary judgment motion reads. That reads:

> The judge put the stay back in place on December 2, 2011. I continued to receive letters and phone calls from Wells Fargo until at least January 11, 2012. I also learned that my home was advertised in the Alabama Messenger for a foreclosure sale on the courthouse steps at about that same time.

13

<u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit A at 5.

As explained below, while the facts may substantiate an uninvited, unpleasant, and bothersome imposition on Ms. Morris, under the law in this Circuit, they do not support a willful violation of the stay.

First, after Well's Fargo's foreclosure attorney became aware of this Court's reinstatement of the stay, she stopped the pending foreclosure. The facts are clear. That action occurred shortly, if not immediately, after the attorney learned of the stay condition.  The exhibits attached to Ms. Morris' response to Wells Fargo's summary judgment motion establish that Ms. Rutledge, the foreclosure attorney, terminated the foreclosure on December 9, 2011, and, on that same date, informed Ms. Morris' attorney that the foreclosure had been terminated. <u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit D. The fact that the foreclosure process was terminated on December 9, 2011, is also attested to by Ms. Amanda Weatherly, a Vice President of Loan Documentation for Wells Fargo, in her affidavit which the bank submitted in support of its motion.  <u>Brief in Support of Motion for Summary Judgment</u>, A.P. Docket No. 16, Exhibit 1.

In contrast, Ms. Morris alleged in her complaint that additional action was necessary, "to stop the foreclosure sale...," for which she, "filed a motion asking this Honorable Court to enforce the stay granted on December 2, 2011 and stop the sale." <u>Id</u>. As Ms. Morris correctly states, "A hearing on that motion was held on January 25, 2012." <u>Id</u>.

The motion referenced in Ms. Morris' complaint was her <u>Motion to Compel Wells Fargo to Comply with Order, Restrain Wells Fargo from Proceeding with Foreclosure Sale, and Sanctions for Violation of the Stay</u>, Case Docket No. 44, filed on January 5, 2012. In it, Ms. Morris alleges that a Wells Fargo employee told her that her home would be sold to the highest bidder on Wednesday, January 11, 2012.

While that motion may have been necessary for other reasons, the Court must find that it was not necessary to stop the impending foreclosure sale. As stated above, Ms. Rutledge, the foreclosure attorney, terminated the foreclosure on December 9, 2011, and, on that same date, informed Ms. Morris' attorney that the foreclosure had been terminated. <u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit D. Hence, the Court must find that Ms. Morris did not have to file either a motion or the present adversary proceeding to prevent Wells Fargo from foreclosing on her home.

Furthermore, it is apparent from Ms. Rutledge's December 7 letter that Ms. Morris learned of the foreclosure well prior to January 11, 2012, the date she represented that a Wells Fargo employee told her that her home would be sold. In contrast, this Court's December 2, 2011, order reimposing the stay reflects that Ms.

Morris informed the Court at the November 29, 2011, hearing that she had been informed by a Wells Fargo employee that foreclosure was imminent.

In addition, in her complaint, Ms. Morris alleges that she received the letter from Ms. Rutledge informing her of the foreclosure sale on or about December 6, 2012.  The "2012" rather than "2011" is obviously a typographical error.  Also, the exhibits attached to her response to Wells Fargo's summary judgment indicate that Ms. Rutledge's letter was not sent until December 7, 2011, instead of December 6, which means that Ms. Morris could not have received it prior to December 8th or 9th.

Ms. Rutledge's response to Ms. Hamilton's email indicates that she did not know that the stay had been reimposed and extended and, in initiating the foreclosure, was operating under her belief that the stay had been lifted and that the order entered by this Court on September 30, 2011, granting Wells Fargo relief from the stay was still in effect. Ms. Rutledge wrote Ms. Hamilton, "Thank you for your email and for notifying us that the bankruptcy stay has been reinstated.  We are closing our foreclosure file and notifying our client."  Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit D.  That conclusion is further bolstered by the fact that Ms. Rutledge indeed terminated the foreclosure immediately upon being informed of the stay reimposition and extension by Ms. Hamilton.

On the other hand, based on the facts in this matter, the Court cannot ignore the imputed knowledge doctrine. Was Ms. Rutledge's ignorance of the stay reimposition and extension prior to instituting the foreclosure something that should be imputed to Wells Fargo or should the presumed knowledge of the stay reimposition and extension acquired by Mr. Tutten by virtue of the Court's email be also?[4]

Of course, it is unknown when Mr. Tutten actually viewed the Court's email notifying him of the December 2 order. Moreover it is unknown whether or not he knew, when he received that email, that Ms. Rutledge had begun the foreclosure process. And, there is nothing in the record which suggests that he knew about Ms. Rutledge's foreclosure letter in time to prevent it from going out or in time to prevent advertisement of the foreclosure from being submitted for publication. Furthermore, it is unreasonable to assume that he knew about the impending foreclosure when he received and reviewed the Court's email, then sat by while Ms. Rutledge subjected herself and Wells Fargo to serious consequences.

---

[4] For practical reasons, imputation of both Ms. Rutledge's knowledge and Mr. Tutten's knowledge would result in one cancelling out the other or subject Wells Fargo to potential whipsaw liability depending on who chooses to pick between the knowledge possessed by one rather than the other.

If anything is imputed to Wells Fargo, it seems only fair, just, equitable, and logical to impute Ms. Rutledge's knowledge, or, more appropriately, her lack thereof, to Wells Fargo since it was by her volition that the foreclosure was initiated and initiation of the foreclosure process is the primary action which Ms. Morris contends violated the stay. In fact, as will be discussed in detail below, it is the only action performed by or on behalf of Wells Fargo which could possibly have constituted a stay violation; however, because of that fact, and because Ms. Rutledge did not know that the stay had been reimposed and extended, knowledge of the stay reimposition and extension could never be imputed to Wells Fargo.

In this regard, Ms. Morris has not offered evidence that Wells Fargo acquired actual knowledge from any other source in time to stop initiation and advertisement of the foreclosure. On the contrary, in her affidavit, Amanda Weatherly, the Vice President of Loan Documentation for Wells Fargo, testified that, according to its records, Wells Fargo did not receive knowledge or notice of the December 2 order until December 9, 2011. She testified, "Wells Fargo received notice of the Court's December 2, 2011 Order altering its previous decision granting Wells Fargo relief from the automatic stay on or about December 9, 2011." Brief in Support of Motion for Summary Judgment, A.P. Docket No. 16, Exhibit 1. That date coincides with the email sent by Ms. Rutledge to Ms. Morris' attorney on December 9 and supports the content of that email, which indicates that Ms. Rutledge, until that point in time, was without knowledge of the stay reimposition and extension. It is also consistent with this Court's Certificate of Notice, Case Docket No. 43, which indicates that notice of the December 2, 2011, order was not placed in the mail until December 5 (even though it specifically reflects that it was mailed on December 4, because the 4th fell on a Sunday). In that regard, it is important to note that Ms. Rutledge was neither on the Sirote bankruptcy email list nor listed as a mail recipient on the certificate of notice.

Based on the above, the Court must conclude that the actions taken by Wells Fargo, via Ms. Rutledge, were not intentional because neither knew that the stay had been put back into place. Instead, those actions were merely inadvertent and cannot provide the basis for the imposition of liability pursuant to 11 U. S. C. § 362(k).

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

### 2. Was Ms. Morris injured
### by anything Ms. Rutledge did?

Intrusion into another person's world, space, or life by an outsider is always a difficult matter for any court to measure. The court must look at the situation after-the-fact, in hindsight, and without any emotional elements attached. The same must consider both sides of the situation and try to understand why each did what it did. Those perspectives are not a reason for, nor an excuse for, ignoring the human

element of such situations, but they are reasons why courts must decide difficult questions. The instant situation raises such a question. Was Ms. Morris injured by anything Ms. Rutledge did?

In regard to Ms. Morris' second argument under her contention that Wells Fargo violated the extended stay by beginning the foreclosure process, Wells Fargo contends, in its summary judgment motion, that Ms Morris was not "injured" by anything of the actions taken by Ms. Rutledge.

No one would like to have to deal with the events Ms. Morris has had to bear, but as indicated above, a threshold for entitlement to relief pursuant to section 362(k) is that an individual must have been "injured" as a result of a stay violation.

In regard to such injury, Ms. Morris does not claim that she suffered any pecuniary damages as a result of anything done by Rutledge, but instead she claims that the injuries she received as a result of Ms. Rutledge's actions were purely emotional in nature. Her corroboration of that claim is the only one that appears in the final, one sentence paragraph of her affidavit, in which she states, "My doctors are willing to testify as to the damages the stress of this process has caused me." Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit A at 5. That proffer is, of course, not evidence this Court may consider. It is not only conjecture about what her doctors may testify to at trial, it is also hearsay that may not be considered as corroboration for her emotional distress claim. Moreover, her claim of "stress" is exactly that sort of generalized evidence which the Eleventh Circuit, in Lodge, denounced as insufficient to support a claim for emotional distress significant enough to warrant a finding of either "injury" or "actual damages" under section 362(k).

As discussed above, Judge Hull explained in Lodge that more than generalized evidence of stress is required to recover for significant emotional distress and that generalized evidence, without any additional, specific detail, does not prove such emotional distress. On the other hand, Judge Hull explained that, "corroborating evidence may not be necessary to prove emotional distress where the violator engaged in egregious conduct and significant emotional distress is readily apparent." Id. (emphasis added).

Unfortunately for Ms. Morris, the Court cannot find in this case that the corroborating exception applies. The facts support the opposite. Wells Fargo's conduct was not egregious and significant emotional distress is not readily apparent, therefore corroboration requires more than Ms. Morris' generalized claims or descriptions of emotional distress are able to prove. Hence, where Ms. Morris did not corroborate alleged significant emotional distress injuries with more than her own affidavit containing generalized claims or descriptions of emotional distress, her contentions will not withstand the defendant's summary judgment motion. The conclusion here is as in Lodge that there was, "Nothing else in the record... [that made] it obvious that the [plaintiff] suffered significant emotional distress." Id. (parentheticals added) (emphasis added).

17

Therefore, the Court finds that because Ms. Rutledge's actions in initiating the foreclosure, and sending the December 7 letter, and advertising the foreclosure in the Alabama Messenger were not egregious, and because emotional distress cannot be presumed, Ms. Morris failed to adequately corroborate her claim of emotional distress.

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.[5]

### 3. Was Ms. Morris injured as a result of calls she received from attorneys neither associated with nor employed by Wells Fargo, and if she was, would Wells Fargo be responsible for those injuries?

In her third argument supporting her contention that Wells Fargo violated the extended stay by beginning the foreclosure process, Ms. Morris alleges that she was "insulted" because four attorneys offered to assist her as a result of reading the foreclosure sale advertisement placed by Ms. Rutledge in the Alabama Messenger.

Because there is no evidence in the record regarding this argument, it is difficult to evaluate. Certainly the Court does not doubt, based on Ms. Morris' representations, that she received calls from four attorneys who had read the legal announcement. What is difficult is that the argument is not supported by any evidence, such as including these incidents in her affidavit. In contrast, Ms. Morris did not mention in her affidavit either the four attorneys, or their offers of assistance, or the fact that she felt "insulted" as a result of those offers. Consequently, there is nothing in the record which corroborates either the fact that she received those calls or that she was "insulted" by them.

Of course, no one would welcome calls regarding a foreclosure, especially if those calls were prompted by legal notices in a newspaper. But it does appear that at the time the calls could have been made, Ms. Morris already knew that the foreclosure had been terminated and would not take place. As such, where the calls could have been the basis for more in a different situation depending of their nature, in this instance, they do not satisfy the kind of conduct required by the law for a violation of the stay.

_____

[5] As Judge Hull wrote, "Because... [the plaintiffs] failed to show an emotional injury sufficient to support a recovery of actual damages under § 362(k), the district court did not err in granting summary judgment in favor of the defendants as to the automatic stay claim." Id. (parenthetical added).

But even if they did, the next question must be, how could Wells Fargo have reasonably foreseen that Ms. Morris would have, as a result of the foreclosure advertisement, been contacted with offers of assistance from attorneys not employed by or associated with Wells Fargo. There is no evidence before the Court which indicates that Wells Fargo knew or should have know, or that a reasonable person would or should have known, that attorneys not employed by or associated with Wells Fargo would call her with offers to assist her in avoiding foreclosure based on the foreclosure advertisement placed by Ms. Rutledge. Similarly, Ms. Morris did not cite, and this Court has not found, any legal authority which supports the facially anomalous position that a foreclosing mortgagee which accidentally or erroneously advertises a foreclosure sale is liable for "insult" felt by a mortgagor as a result of receiving offers of assistance from attorneys not employed by or associated with the mortgagee.[6]

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

## B. Making Calls and Sending Letters

Ms. Morris' second contention relates to whether other written and verbal communications she received from Wells Fargo employees violated the automatic stay. Because many of the specific events complained of occurred outside of the parameters of section 362, that issue must be considered first.

### 1. General Discussion

It appears that Ms. Morris views the entire continuum of her acrimonious relationship with Wells Fargo since its inception in 2004 to fall within the ambit of section 362(a), as evidenced by the fact that 11 of the 20 paragraphs of Ms. Morris' affidavit describe events and circumstances which occurred pre-petition. A.P. Docket No. 34, Exhibit A at 1-4. In contrast, as a legal matter, section 362(a) prohibits only post-petition activities. Consequently, none of the circumstances and factors described by Ms. Morris in paragraphs 2 through 12 of her affidavit can form a basis for section 362(k) liability and all are irrelevant to the present adversary proceeding. Id.

---

[6] Any such solicitations received by Ms. Morris would be patently unethical under Alabama Rules of Professional Conduct Rule 7.3, entitled "Direct Contact with Prospective Clients." That rule provides, "A lawyer shall not solicit professional employment from a prospective client with whom the lawyer has no familial or current or prior professional relationship, in person or otherwise, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." Because Wells Fargo could not have reasonably foreseen that Ms. Morris would receive offers of assistance from attorneys not in its employ, much less offers that those attorneys were ethically prohibited from making, this Court cannot conclude as a matter of law that Ms. Rutledge's improvident foreclosure advertisement proximately caused the "insult" allegedly felt by Ms. Morris as a result of receiving those offers.

19

It also appears from paragraphs 14 through 17 of her affidavit that Ms. Morris considers communications that she received from Wells Fargo employees <u>after</u> the stay was lifted but <u>before</u> it was reimposed to be sanctionable under section 362(k). Those paragraphs include:

> 14. I wanted to reaffirm my mortgage and keep my house and agreed to a release from the stay for Wells Fargo in effort to work out a loan modification. I was promised by the attorney representing Wells Fargo at that time that he would arrange for a face-to-face meeting with a loan modification officer to accomplish that goal. After at least ten hours on the phone with various Wells Fargo employees, I was finally told that no face-to-face meeting would occur.

> 15. I began to receive daily calls from Wells Fargo employees demanding my financial and personal information over the phone and that certain information, such as my divorce decree and my social security award letter, must be faxed to them on at least a weekly basis, so it didn't get "stale".

> 16. After complying for about six weeks, I asked that the stay be put back in place for Wells Fargo as they had failed to complete their part of the agreement made when it was put in place.

<u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit A at 4-5.

Again, as a matter of law, the actions taken while the stay was not in force, that is after it was lifted but before it was reimposed, were not prohibited by section 362(a). Therefore, again, those actions cannot provide a basis for section 362(k) liability. Consequently, like paragraphs 2 through 12, paragraphs 14 through 16 do not provide any factual support for, or evidence of, Ms. Morris' section 362(k) action.

What section 362 prohibits and what circumstances can support Ms. Morris' alleged section 362(k) cause of action are those that occurred either after the case was filed and <u>before</u> relief from the stay was granted on September 30, 2011, or <u>after</u> the stay was reimposed on December 2, 2011. Because Ms. Morris did not describe any such actions in her complaint or her affidavit that were taken by Wells Fargo or its employees or attorneys after she filed her case and before the stay was lifted on September 30, 2011, the Court is left to consider whether there were any actions after December 2, 2011, the date the Court reimposed the stay, which may support a section 362(k) cause of action.

In this regard, Ms. Morris' complaint contains the following allegations with respect to communications she received from Wells Fargo employees after December 2, 2011. Those include:

Beginning on December 5, 2011, a representative of Wells Fargo, namely a Jamie Allen, contacted Ms. Morris on a daily basis starting each conversation by requiring Ms. Morris to state her full name, address and telephone number. She then read a disclaimer to Ms. Morris that specifically stated the call was an attempt to collect a debt. Allen continually required Ms. Morris to fax information to her, claiming it is required for consideration of a loan modification. She faxed several copies of information from social security regarding her disability check, her divorce papers at least twice, and every other item requested in an effort to obtain the modification. Initially, Ms. Allen seemed helpful and hopeful with Ms. Morris and told her she was sure they could work out a solution. With each call her attitude digressed further into veiled threats and rudeness and continued to tell Ms. Morris that her home would be sold to the highest bidder on Wednesday, January 11, 2012. Those calls ended on January 10, 2012, only after Ms. Morris had filed a motion with the Honorable Court seeking assistance.

Additionally, Ms. Morris was contacted by Ms. Ginny Rutledge, Esq. on or about December 6, 2012 by mail informing her that her home would be sold in foreclosure. Ms. Rutledge was contacted by Debtor's attorney and informed of the stay. She responded that she would inform her client. Despite that notification, the **calls and letters** from Wells Fargo continued to come.

....

In an effort to stop the foreclosure sale, Ms. Morris filed a motion asking this Honorable Court to enforce the stay granted on December 2, 2011 and stop the sale. A hearing on that motion was held on January 25, 2012. After the hearing, Ms. Morris and her counsel met with Mr. Tom Tutten, legal representative for Wells Fargo, who assured Ms. Morris that there would be no foreclosure and that a reasonable modification was forthcoming. About three weeks later, a modification was offered. Currently, Ms. Morris's current delinquent loan is for approximately $124,091.46 with a monthly payment of $903.65 with approximately 22years left to pay. The modification offered would extend the loan to a period of forty (40) years with a new payment of $795.33. This represents an increase of over $139,000 in the amount Ms. Morris would be required to pay for the house, which she considers to be unconscionable, unreasonable and predatory.

Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2. (emphasis added).[7]

Ms. Morris' complaint is informative, but it is not verified. Therefore, particularly in the context of opposing a motion for summary judgment, it cannot be considered evidence of the alleged conversations between her and a representative of Wells Fargo named Jamie Allen, or of any other conversations between her and representatives of Wells Fargo, or of any letters or correspondence that she received from Wells Fargo, particularly in response to a motion for summary judgment. Similarly, Ms. Morris' affidavit does not refer to or describe any conversation between her and a representative of Wells Fargo named Jamie Allen or any other specifically named representative of Wells Fargo, or any specific or particular conversation with any Wells Fargo representative, or any particular correspondence that she received from any Wells Fargo representative other than the letter regarding institution of the foreclosure process that she received from Ms. Rutledge. She merely stated that, "The judge put the stay back in place on December 2, 2011," and she, "continued to receive letters and phone calls from Wells Fargo until at least January 11, 2012," without providing any particulars with respect to those conversations and letters such as how many conversations she had and letters she received, who she talked to, what the substance of those conversations and letters were and so forth. Consequently, Ms. Morris' affidavit does not provide proof or corroboration with respect to the nature of the phone calls and letters she allegedly received after December 2, 2011, from Wells Fargo employees. In addition, the Court cannot find any other evidence in the record that does supply such support.[8]

_____

[7] The omitted paragraph concerns the calls by the four attorneys. The final paragraph quoted above is discussed in Section C below.

[8] Even if proved at trial, the facts alleged by Ms. Morris in her compliant with respect to calls and correspondence that she allegedly received from Wells Fargo employees after December 2, 2011, would not entitle her to relief pursuant to section 362(k). As indicated before, the purpose of the order reimposing and extending the stay was to maintain the status quo between the parties while they engaged in further negotiations designed for the purpose of accomplishing, if possible, a modification of Ms. Morris' loan. It specifically contemplated that Ms. Morris would communicate with Wells Fargo, through its employees and representatives, about the potential loan modification and that Wells Fargo, through its employees and representatives, would communicate with Ms. Morris about the potential loan modification. Those are precisely the types of conversations Ms. Morris said in her complaint that she had with "Jamie Allen." Ms. Morris described those conversations as having taken place for "consideration of a loan modification," and "in an effort to obtain the modification," and to "work out a solution." Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2.

In its December 2 order, the Court included Ms. Morris' representations that she had been engaged in promising conversations with a Wells Fargo employee, who had informed her either "that a loan modification had been approved, or that one was at least possible," and had

22

In addition, Ms. Morris' generic reference to "calls and letters" she received from Wells Fargo after her attorney emailed Ms. Rutledge on December 9, 2011, does not indicate that the subjects of those calls and letters were not also related to the loan modification. This conclusion is supported by the fact that there is nothing in Ms. Morris' affidavit that suggests that any of the phone calls and letters were about or related to anything other than her efforts to obtain a loan modification and Wells Fargo's efforts to provide her with a loan modification.

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

## 2. Specific Allegations Regarding Telephone Calls

Ms. Morris alleged in her complaint that, "With each call her [referring to Ms. Allen] attitude digressed further into veiled threats and rudeness...." Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2. (parenthetical added). Similar to the above, the law requires more. The terms "veiled threats" and "rudeness" standing alone create no basis for 362(k) liability absent explanation of what was allegedly threatened, and how the alleged rudeness was manifested, and how the "veiled threats" and "rudeness" were connected with any action that actually violated the stay. In that regard, Ms. Morris did not mention, explain, or elaborate any such proof in her affidavit, and she did not describe in her affidavit anything done by Wells Fargo or its employees which could, under the law, demonstrate any such stay violation. Therefore, Ms. Morris' allegation in her complaint that Ms. Allen's conversations

---

"assured her that this representative would be the debtor's only contact for arranging the modification, and that this representative would follow the process to a conclusion." Order Setting Aside September 30, 2011, Lift of Stay Order, Case Docket No. 40. There is no doubt in making those representations to the Court that Ms. Morris was describing conversations she had had with Ms. Allen, who, as indicated in the letter which she sent Ms. Morris on November 17, 2011, had been assigned to work with Ms. Morris on a loan modification. Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit F. Those conversations all took place for the purpose of negotiating a loan modification. The December 2 order was entered in order to allow those conversations and similar communications to continue and it is apparent that those conversations did in fact, continue, after December 2, although not to Ms. Morris' ultimate satisfaction. And the fact that Ms. Morris, per her representations to the Court at the November 29, 2011, hearing, had been discussing a loan modification with Ms. Allen before entry of the order reimposing the stay, coupled with the description in the complaint of continued loan modification discussions which she had with Ms. Allen after entry of that order, indicate that the singular subject of all of the conversations which Ms. Morris had with Ms. Allen was potential modification of the loan and nothing else. Since conversations relating to loan modification were contemplated and authorized as an exception to the reimposed stay by the December 2 order, the phone calls made by Ms. Allen to Ms. Morris could not have violated the stay.

23

contained "veiled threats" and "rudeness," without that legal support, cannot state a cause of action for violation of the stay.

Also in regard to specific complaints about telephone calls, Ms. Morris alleged that Ms. Allen, "continued to tell... [her] that her home would be sold to the highest bidder on Wednesday, January 11, 2012." Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2. (parenthetical added). Both Ms. Morris and her attorney knew that by virtue of this Court's order of December 2, 2011, the stay would prevent Wells Fargo from foreclosing her mortgage.  And by virtue of Ms. Rutledge's email to Ms. Morris' attorney on December 9, 2011, Ms. Morris knew that the foreclosure had been terminated.  It is not therefore apparent how Ms. Allen's alleged representations that the foreclosure would take place on January 11, 2012, even if any of them occurred after reimposition of the stay on December 2, could have constituted a violation of the stay or how Ms. Morris could possibly have been misled by any such representation, and there was nothing in her affidavit to change this conclusion.

Also in regard to specific complaints about telephone calls, Ms. Morris alleged in her complaint that before a conversation, or every conversation, Ms. Allen, "read a disclaimer to [her] that specifically stated the call was an attempt to collect a debt." Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2.  The legal significance of that allegation is not readily apparent, but the Court presumes it was made to show that the conversations initiated by Ms. Allen constituted an effort to collect the mortgage debt which in ordinary circumstances would be prohibited by the automatic stay.[9]  As indicated before, however, the circumstances involved in this case are not ordinary. Even if conversations relating to working out loan modifications can ordinarily be characterized as efforts to collect a debt or not, for that reason the conversations initiated by Ms. Allen must be exempted from the reimposed stay. Otherwise, negotiations with respect to a possible loan modification would have been impossible.[10]

---

[9] Section 1692e(11) of the Fair Debt Collection Practices Act (FDCPA), Pub. L. 95-109; 91 Stat. 874, codified as 15 U.S.C. § 1692 et seq., reads:

> The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

15 U.S.C. § 1692e(11).

[10] Ms. Morris did not cite any legal authority for the proposition of how a mortgage loan servicer's compliance with 15 U.S.C. § 1692e(11) as part of a conversation which does not

And finally in regard to telephone calls, it must not be forgotten that the order the Court entered was <u>extraordinary</u>. The stay lifted pursuant to a previous order. The Court was not only wiling to set aside that result and reimpose the stay, all based on Ms. Morris' remarks, it was also willing to reimpose the stay for six months. The Court sincerely hoped that this amount of time was sufficient for Ms. Morris to reach an agreement with Wells Fargo and to save her home. But if not, the inevitability of foreclosure in the event Ms. Morris might eventually prove unable to reach an agreement modifying her loan with Wells Fargo was a stark reality.  Avoiding foreclosure was an important part of the discussions with Wells Fargo. Therefore, discussion of the possibility of foreclosure was an unavoidable and critical part of any conversation. As such, it was entirely natural and permissible for Ms. Allen to have broached that subject during her negotiations with Ms. Morris as part of the process of their mutually working to avoid that deleterious ending.  Indeed, to force either party to treat the possibility of foreclosure as forbidden would have a disservice to both. Wells Fargo would have been deprived of its sole remaining bit of leverage and Ms. Morris could have been lulled into believing that a compromise on Wells Fargo's part was somehow mandatory and that foreclosure had been conclusively averted.

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

### 3.  Allegations Relating to Correspondence

Ms. Morris attached to her response to Wells Fargo's summary judgment motion copies of the correspondence that she received from Wells Fargo employees.  Each of those items concerns itself with helping Ms. Morris work out arrangements to avoid losing her home to foreclosure.  One of those letters was a separate letter Ms. Rutledge sent Ms. Morris along with her December 7, 2011, letter advising Ms. Morris that the foreclosure process had been instituted. That separate letter, with the same date, offered Ms. Morris the opportunity to explore alternatives to foreclosure. It included:

> Our Client, Wells Fargo Bank, N.A., has referred your loan to us for foreclosure. While the foreclosure process has begun, you may still have foreclosure prevention alternatives available to you.

> If you are interested in avoiding foreclosure, you should contact Wells Fargo Bank. N.A. about your situation so that Wells Fargo Bank, N.A. can determine whether you qualify for temporary or long-term relief. Wells Fargo Bank, N.A. may have previously sent you a letter advising you of possible alternatives to foreclosure, along with the documents for

---

otherwise violate the stay could become a stay violation, and the Court knows of none.

you to complete and return to Wells Fargo Bank, N.A. to be evaluated for these alternatives. If you did not receive or no longer have the documents, or have not returned all of the documents, please contact Wells Fargo Bank, N.A. at 1-800-662-5014.

Even if you have previously indicated that you are not interested in saving your home, you can still be evaluated for alternatives to foreclosure. If you need assistance, please contact Wells Fargo Bank, N.A. at 1-800-662-5014.

Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit D at 4.

Also attached to Ms. Morris' response to Wells Fargo's summary judgment motion is a copy of a letter from "Jamie Allen," a "loan preservation specialist," dated November 17, 2011. It included:

Now that you've been assigned a Wells Fargo loan preservation specialist to work with you, I'm writing to formally introduce myself.

Im Jamie Allen, a home preservation specialist with Wells Fargo Home Mortgage. In this role, I am dedicated to helping you with your request for mortgage assistance. I will be your primary contact, and you can count on me to personally assist you through every step of the process. I can be reached at 1-877-808-6146 ext 48224.

**How I'll be assisting you**
Working closely with you, I'll explore all available options to find one that might be right for your situation. I will keep you well-informed and do all I can to move you through the process as quickly as possible.

Along the way, please respond promptly to any communications and requests for information you receive. And keep in mind, if you do not provide information in a timely manner, it could impact your eligibility for mortgage assistance. If you have any questions at any time, I'm here to help you. so don't hesitate to reach out to me.

Please read the enclosed flyer for more details on how we'll be working together. I'm committed to helping you through the process and making it the best experience possible. That's why I welcome your feedback at any point - whether it's to share something positive, or if you have concerns with something that I was not able to help you with. Just let me know, and I'll be happy to put you in touch with my manager.

**I'm here to help you**

I look forward to working with you and encourage you to contact me with any questions you may have. You can reach me at 1-877-808-6146 ext. 48224.

<u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit F3 at 1-2.

This letter was sent to Ms. Morris after the stay was lifted and before it was reinstated, therefore it could not, under any circumstance, constitute a violation of the stay regardless of its content. Moreover, its content clearly reflects that its purpose was to assist Ms. Morris with obtaining a loan modification, which, as indicated before, was contemplated by and entirely permissible under this Court's December 2 order.

A third letter Ms. Morris attached was one she received from Wells Fargo on January 20, 2012, from Marcella McGrath, a Wells Fargo "home preservation bankruptcy specialist." It included:

I'd like to take this opportunity to introduce myself. My name is Marcella McGrath and I'm writing to let you know that during the course of your bankruptcy case, I will be your new Wells Fargo home preservation bankruptcy specialist.

Previously another specialist may have been assisting you, and now I'll serve as your dedicated home preservation bankruptcy specialist. In this role, I will be your primary contact, working closely with you and helping you through every step of the mortgage assistance process. I'm committed to helping you through the process and making it the best experience possible. That's why I welcome your feedback at any point - whether its to share something positive, or if you have concerns with something that I was not able to help you with. Just let me know, and I'll be happy to put you in touch with my manager.

Please note that your decision to discuss workout options with Wells Fargo Home Mortgage is strictly voluntary. You are not obligated to pursue any workout options discussed with us. At your request, we will immediately terminate any such discussions should you no longer wish to pursue these options. Additionally, if you have or will receive a discharge from a chapter 7 bankruptcy case, and the mortgage was not reaffirmed in the bankruptcy case, we will only exercise our rights against the property and are not attempting any act to collect the discharged debt from you personally.

You can count on me to keep you well-informed about your loan, the process, and next steps. I'm here to help you in any way I can. Please feel free to contact me with any questions you may have along the way.

27

You can reach me at 1-877-808-6146 ext. 46346.

I'm pleased to have this opportunity to help you, and look forward to working with you.

Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit F3 at 4-5.

Like the November 17, 2011, letter from Ms. Allen, the content of this January 20, 2012, letter from Ms. McGrath clearly reflects that her purpose in sending it was to assist Ms. Morris with obtaining a loan modification. It was, therefore, contemplated by and entirely permissible under this Court's December 2 order reimposing the stay, and, for that reason, could not have constituted a stay violation.

A few days later, Wells Fargo inexplicably replaced Ms. McGrath with Eric Dobey as Ms. Morris' "home preservation bankruptcy specialist."  On January 25, 2012, Mr. Dobey sent a letter to Ms. Morris introducing himself as such.  Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit F3 at 6.  The content of the letter is identical to Ms. McGrath's January 20 letter and likewise reflects that Mr. Dobey's purpose in sending it was to assist Ms. Morris with obtaining a loan modification.  It was, therefore, like Ms. Allen's November 17 letter and Ms. McGrath's January 20 letter, contemplated by and entirely permissible under the Court's December 2 order reimposing the stay, and, like those letters, could not have violated the stay.

And finally, the Court certainly understands why Ms. Morris could have been aggravated by Wells Fargo's multiple changes in "home preservation bankruptcy specialist[s]." But as discussed above, the law requires more. That additional proof is not present here, and therefore those changes were not prohibited by section 362(a), and did not, therefore, constitute stay violations.

In summary, the Court finds that the second December 7 letter from Ms. Rutledge, offering to work with Ms. Morris to avoid foreclosure, did not violate the reimposed stay because Ms. Rutledge did not know the stay had been reimposed. In addition, for this letter and the November 17 letter from Ms. Allen, the January 20 letter from Ms. McGrath, and the January 25 letter from Mr. Dobey, none could have violated the stay because this Court's order reimposing the stay contemplated that Wells Fargo representatives would continue to communicate with Ms. Morris for the purpose of attempting to workout a loan modification.[11]

---

[11] Also, as stated above, Ms. Allen's November 17 letter could not possibly have violated the stay because it was sent when the stay was not in effect.

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

### C. Failing to Provide a "Reasonable" Loan Modification

Ms. Morris also contends that Wells Fargo violated the reimposed stay by not offering her a "reasonable" mortgage modification. She alleged in her complaint:

> In an effort to stop the foreclosure sale, Ms. Morris filed a motion asking this Honorable Court to enforce the stay granted on December 2, 2011 and stop the sale. A hearing on that motion was held on January 25, 2012. After the hearing, Ms. Morris and her counsel met with Mr. Tom Tutten, legal representative for Wells Fargo, who assured Ms. Morris that there would be no foreclosure and that a reasonable modification was forthcoming. About three weeks later, a modification was offered. Currently, Ms. Morris's current delinquent loan is for approximately $124,091.46 with a monthly payment of $903.65 with approximately 22years left to pay. The modification offered would extend the loan to a period of forty (40) years with a new payment of $795.33. This represents an increase of over $139,000 in the amount Ms. Morris would be required to pay for the house, which she considers to be unconscionable, unreasonable and predatory. The Debtor requests that this honorable Court find Wells Fargo in contempt of its order regarding the stay and require that Wells Fargo be ordered to pay damages to the Debtor for their failure to comply.

Complaint Against Wells Fargo for Violation of the Stay, A.P. Docket No. 1 at 2.

First, if for no other reason, this allegation must be denied based on the loan modification law in this Circuit. To the extent Ms. Morris' statements constitute an effort to state a cause of action under the Home Affordable Modification Program created by the United States Department of the Treasury pursuant to the Emergency Economic Stabilization Act of 2008, 2 U.S.C. §§ 5201–5261, they are unsuccessful. In Miller v. Chase Home Finance, LLC, 677 F.3d 1113, 1116 (11th Cir. 2012), the Eleventh Circuit Court of Appeals held that a borrower has no private cause of action under HAMP against a lender that refuses to modify a loan.

Second, to the extent that Ms. Morris may be entitled to a loan modification for some other purpose, or she has a cause of action simply because she was "promised" a "reasonable" one by one of Wells Fargo's attorneys, more information is needed.

It appears that "reasonable" to Ms. Morris means a modification that fits her monthly budget and does not involve an extension of the term of the loan. While it is not possible to argue that such a modification would be welcomed by any home owner,

as a practical matter, such an accommodation could not be accomplished without the mortgagee sacrificing part of the principal that it is owed and/or essentially allowing the mortgagor to forego paying interest for a substantial remainder of the loan's term. But this situation does appear to be the primary motivating factor for Ms. Morris in her filing the present adversary proceeding. She indicated that, more or less, in her affidavit. She testified:

> 18. In March 2012, I was offered a loan modification by Wells Fargo. The terms of the modification were unreasonable to me so I refused to accept it. Wells Fargo wanted to extend the life of my loan from the original 30-year period of 2004-34 to a period of 40 years from 2012-52. Over the extended period, the cost to me would be over an additional $152,000- more than double what is owed on the house now. <u>This suit was filed at that time</u>.

<u>Response to Defendant's Motion for Summary Judgment</u>, A.P. Docket No. 34, Exhibit A at 5 (emphasis added).

Section 362(a), like other law in this Circuit, does not contain anything which requires Well Fargo to provide Ms. Morris with a loan modification, whether reasonable or not, and does not contain anything which prohibits Wells Fargo from refusing to offer Ms. Morris a loan modification, whether reasonable or not. Nor does it require any other secured creditor to provide any other debtor with a loan modification, whether reasonable or not, or prohibit any other secured creditor from refusing to offer any other debtor a loan modification, whether reasonable or not. Therefore, as a matter of law, Section 362(k), which only supplies a remedy for violation of the provisions of section 362(a), provides Ms. Morris no legal remedy, or cause of action, or right to relief, based on Wells Fargo's failure or refusal to offer her a loan modification, whether reasonable or not.

While Ms. Morris did not cite any other statute which would entitle her to relief against Wells Fargo for its refusal to offer her a "reasonable" loan modification, she does reference this Court's order of December 2, 2011, as a basis for holding Wells Fargo in contempt. But on this point, like Ms. Morris, that order does cite any statute which requires Well Fargo to modify its mortgage loan in any respect or to otherwise offer Ms. Morris a loan modification, whether one considers "reasonable" or not. That order merely set aside the previous order granting Wells Fargo relief from the stay and reimposed the stay as to Wells Fargo for a period of 180 days, for the singular purpose of permitting the parties a period of time to voluntarily negotiate a loan modification if possible. It read, "That stay shall remain in effect as to Wells Fargo for **180 DAYS** from the entry of this order to allow the parties sufficient time to attempt to reach an agreement on modification of the debtor's loan." <u>Order Setting Aside September 30, 2011, Lift of Stay Order</u>, Case Docket No. 40. Consequently, Ms. Morris' claim for damages based on Wells Fargo's alleged noncompliance with the terms of that order also fails to state a section 362 claim or any other claim upon which relief may be granted.

30

Finally, in regard to the "reasonable" order Ms. Morris seeks, she alleged in her complaint that after the hearing held on January 25, 2012, Mr. Tutten promised her that "a reasonable modification was forthcoming" from Wells Fargo. <u>Complaint Against Wells Fargo for Violation of the Stay</u>, A.P. Docket No. 1 at 2. But again, she does not support that allegation with evidence, particularly, she does not mention it in her affidavit. The legal problem for Ms. Morris is that because she did not, presumably because she could not, allege that the "reasonable modification" promise was in writing or has been embodied in a written document, which has been subscribed to by someone on behalf of Wells Fargo, and which expresses the consideration for that promise. Because those legal criteria have not been satisfied, Mr. Tutten's commitment, on Wells Fargo's behalf, to offer Ms. Morris a "reasonable modification" of her loan is void by virtue of Alabama's Statute of Frauds. That statute reads in pertinent part:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
> ...
>
> (7) Every agreement or commitment to lend money, delay or forebear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000;

Code of Alabama 1975, § 8-9-2(7).

In addition, even if the alleged commitment was not void by virtue of the Alabama Statute of Frauds, it could not a basis for relief for Ms. Morris because there is nothing in the record which reflects that she gave any consideration for it, and there was obviously no meeting of the minds about what the parties each intended would constitute a "reasonable" modification. The parties' after-the-fact characterizations of the offer prove that point, as Ms. Morris claims that the loan modification that she was subsequently offered was patently unreasonable whereas Wells Fargo no doubt considered it eminently reasonable.

In either event, this Court would have no basis for determining which party is correct and no right to interject an interpretation of the term "reasonable modification" which does not comport with the intentions of the parties. Any such unilateral commitment would simply be unenforceable.

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

## D. Violating a National Consent Settlement

Ms. Morris' fourth contention in her response to Wells Fargo's summary judgment motion is that Wells Fargo violated, in several respects, a settlement reached between it, along with several other major mortgage servicers, and the attorney generals of various states pertaining to questionable mortgage servicing practices. As proof, she attached to her brief a photocopy of a newspaper article and copies of portions of a webpage at www.nationalmortgagesettlement.com. Response to Defendant's Motion for Summary Judgment, A.P. Docket No. 34, Exhibit F1. Unfortunately, Ms. Morris did not provide a copy of the settlement agreement which she claims that Wells Fargo breached. Without the legal document upon which she grounds her claim, the Court has no legal basis for determining whether or not it provides her with a right to relief. Simply pointing the Court in a general direction via a newspaper article and reference to a webpage is not a substitute for evidence and legal authority.

In addition, Ms. Morris did not attempt to state a claim for relief in her complaint based on violation of the alleged settlement agreement. In fact, she did not mention the settlement agreement in her complaint. Consequently, whether Wells Fargo violated the terms of that alleged settlement, and whether Ms. Morris is entitled to relief based on any such violations, are not litigable issues in this action and could not have been made so by Ms. Morris' having raised and discussed them in her brief. In contrast, while she could have made those issues litigable in this case by amending her complaint pursuant to Fed. R. Bankr. P. 7015 to add a claim based on violations of the settlement agreement, she has not done so. The law in this Circuit is clear. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Accord Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez, 659 F.3d 42, 53 (1st Cir. 2011); Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1309-1310 (11th Cir. 2007); Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1296-1297 (11th Cir. 2006); Tucker v. Union of Needletrades, Industrial and Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005).

And finally, even if Ms. Morris had mentioned the alleged settlement agreement in her complaint, and sought relief based on that agreement, it could not have been granted under the penumbra of section 362(k) because section 362(k) concerns itself solely with remedying violations of the automatic stay rather than violations of settlement agreements relating to loan servicing practices. And if Wells Fargo indeed violated the terms of the alleged settlement agreement during its post-petition dealings with Ms. Morris, which is the scenario that she describes in her brief, her recourse lies in a forum other than this one because the resolution of any such lawsuit would have no conceivable effect on the administration of the estate in her bankruptcy case. The conduct giving rise to the claim occurred after Ms. Morris filed her bankruptcy petition. Therefore, the cause of action is not property of the estate and any damages she might

32

be awarded would belong strictly to her.  Consequently, the claim is not "related to a case under title 11," which is the minimum required for federal bankruptcy jurisdiction to exist under 28 U.S.C. § 1334(b).  <u>Community Bank of Homestead v. Boone (In re Boone)</u>, 52 F.3d 958 (11th Cir. 1995).

Consequently, as to this point, the Court finds that Ms. Morris did not as a matter of fact or law prove that the defendant violated the automatic stay of section 362 of the Bankruptcy Code.

## V.  Conclusion

Because Ms. Morris did not prove as a matter of fact or law that Wells Fargo violated the automatic stay of section 362 of the Bankruptcy Code, the Court concludes that Wells Fargo is entitled judgment under the summary judgment standards outlined by the Court of Appeals for the Eleventh Circuit in <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112 (11th Cir. 1993) because the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.[12]

---

[12] These standards are <u>particularly important</u> in the instant proceeding where the movant met its initial burden, but the non-movant did not respond in kind. Those standards are:

### A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment  if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The substantive law applicable to the case determines which facts are material.  The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor.

In <u>Adickes v. Kress</u>, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment.  The operation of this framework was modified significantly in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The current framework is set out below.

### B. Movant's Initial Burden

The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

33

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

### 1. For Issues on Which Movant
### Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, <u>Celotex</u> requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

### 2. For Issues on Which Non-Movant
### Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show, that is, point out to the district court--that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

### C. Non-Movant's Responsibility Once
### Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

### 1. For Issues on Which Movant
### Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's

34

Therefore, because there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law, Wells Fargo's <u>Motion for Summary Judgment</u> is due to be granted.

## VI.  Order

A separate Order will be entered contemporaneously with this Memorandum Opinion.

Dated: July 28, 2014

/s/Benjamin Cohen
BENJAMIN COHEN
United States Bankruptcy Judge

BC:csm

---

evidence on the particular material fact.  Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial--that is, such that no reasonable jury could find for the non-movant --should the movant be permitted to prevail without a full trial on the issues.

### 2. For Issues on Which Non-Movant
### Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue.  Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated.  Where the movant did the latter, the non-movant must respond in one of two ways.  First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence.  Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

2 F.3d 1115 -1117 (for the sake of clarity and brevity, internal quotation marks, citations, footnotes, indentations, brackets, and ellipses have been omitted).